**FILED**
**U.S. DISTRICT COURT**
**EASTERN DISTRICT ARKANSAS**

FEB 2 8 2022

TAMMY H. DOWNS, CLERK
By:_____
                                    **DEP CLERK**

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS

TIMOTHY JUSTIN JOYNER                        PLAINTIFF/PETITIONER

VS.                                    4:22-cv-00183-LPR-PSH

DEXTER PAYNE, Director,
Arkansas Division of Correction               DEFENDANT/RESPONDENT

## PETITION FOR WRIT OF HABEAS CORPUS
### BY PERSON IN STATE CUSTODY

Comes the Petitioner, Timothy Justin Joyner,  through his attorney, Jeff Rosenzweig, and for his Petition for Writ of Habeas Corpus by Person in State Custody states:

1.    Timothy Justin Joyner is an inmate of the Arkansas Department of Correction.    Joyner was convicted of four (4) counts of Rape and one  count of Terroristic Threatening in the First Degree in the Circuit Court of Stone County Arkansas and was sentenced to 40 years on each Rape count six years for Terroristic Threatening, all concurrent.    He also later pleaded guilty to Felon in Possession of a Firearm and was sentenced to six years concurrent.    This petition seeks vacation of the Rape and Terroristic Threatening convictions.    Joyner does not challenge the plea to Felon in Possesion of a Firearm.

This case assigned to District Judge Rudofsky
and to Magistrate Judge Harris

2.  Dexter Payne is Director of the Arkansas Division of Correction and as such has custody and control of Green.

3.  This petition is brought under authority of 28 U.S.C. § 2241 et seq, particularly 28 U.S.C. § 2254.  Joyner alleges that his convictions and sentences were obtained by violation of his rights guaranteed under the Constitution and laws of the United States.

4.  Joyner is incarcerated at the Cummins Unit in Lincoln County, which is located in the Eastern District of Arkansas.  The county of conviction, Stone County, is also in the Eastern District.  Venue is therefore appropriate in the Eastern District.

5.  This Court has jurisdiction of this matter under the aforementioned 28 U.S.C. § 2241 et seq., as well as 28 U.S.C. § 1331, which gives the District Courts jurisdiction over federal questions.

6.  This petition is timely.  28 U.S.C. 2244(d)(1) provides that a one year period of limitation shall apply to an application for a writ of habeas corpus, running from the latest of, relevantly here,  the date on which the judgment became final by the conclusion of direct review  or the expiration of the time for seeking such review, with time tolled for a properly filed state postconviction petition.  The following is the relevant time schedule:

❑  Joyner's  convictions were affirmed by the Arkansas Supreme Court in an

opinion issued on April 2, 2009.    The decision was reported as *Joyner v. State*,   2009 Ark. 168, 303 S.W.3d 54. [*Joyner I*]  The mandate was stayed to permit Joyner to seek certiorari in the United States Supreme Court.

❏  Joyner filed a timely petition in the United States Supreme Court on June 30, 2009.  (Case 09-10).    The petition was denied on November 30, 2009. Because a decision on direct appeal becomes final on the denial of certiorari or the expiration of time in which to file, whichever is later, the  one year began at that time.   The Arkansas Supreme Court's mandate was issued on December 4, 2009.    The 60-day period for filing the Rule 37 petition commenced upon issuance of the mandate.

❏  Joyner filed a timely Rule 37 petition in the Stone County Circuit Court on Monday,   February 1, 2010.

❏  Relief was denied in the Stone Circuit Court on February 6, 2020.   A timely notice of appeal was filed on February 21, 2020.

❏  The Rule 37 denial was affirmed by the Arkansas Supreme Court by decision issued on April 15, 2021.   It is reported as *Joyner v. State*,   2021 Ark. 78. 621 S.W.3d 124. [*Joyner II*]  The mandate was issued on May 4, 2021.  The time for filing a habeas petition resumed running at that time.    *Payne v. Kemna*,   441 F.3d 570 (8th Cir.  2006).

3

❑   Therefore, under the strictest interpretation of the applicable statute and rules,

the petition is timely if filed by March 3, 2022.   This petition being clearly

filed before then is timely.

7.   The following claims were made on direct appeal:

I.

THE TRIAL COURT ERRED IN DENYING JOYNER'S
MOTION TO PERMIT TESTIMONY CONCERNING
PRIOR CLAIMS OF SEXUAL ABUSE MADE BY THE
ALLEGED VICTIM.

II.

THE TRIAL COURT ERRED IN REFUSING TO GRANT
A MISTRIAL OR A NEW TRIAL BECAUSE OF A
DISCOVERY   VIOLATION   INVOLVING   THE
RECALCULATION OF DNA PROBABILITIES BY A
CRIME LABORATORY ANALYST.

III.

THE TRIAL COURT ERRED IN REFUSING TO
INSTRUCT ON THE LESSER OFFENSE OF SEXUAL
ASSAULT IN THE SECOND DEGREE ON ONE OF
THE COUNTS.

8.   In Rule 37, the following claims were made.

I.

THE CIRCUIT COURT CLEARLY ERRED IN FINDING
TRIAL   COUNSEL   WAS   NOT   DEFICIENT   FOR
FAILING   TO   SECURE   A   MISTRIAL   WHEN

UNDISCLOSED EXPERT OPINION TESTIMONY WAS
FIRST REVEALED DURING TRIAL IN VIOLATION
OF THE ARKANSAS RULES OF DISCOVERY.

II.

THE CIRCUIT COURT CLEARLY ERRED IN FINDING
TRIAL COUNSEL WAS NOT DEFICIENT FOR
FAILURE TO SECURE ADMISSIBLE RELEVANT
EVIDENCE.

III.

THE CIRCUIT COURT CLEARLY ERRED IN FINDING
TRIAL COUNSEL WAS NOT DEFICIENT FOR
FAILURE TO GIVE EFFECTIVE ASSISTANCE OF
COUNSEL DURING PLEA NEGOTIATIONS.

IV.

TRIAL COUNSEL WAS INEFFECTIVE BASED ON
THE CUMULATIVE ERRORS IN THIS CASE.

V.

THE CIRCUIT COURT ABUSED ITS DISCRETION IN
STRIKING THE TESTIMONY OF APPELLANT'S
EXPERT WITNESS THOMAS PAVLINIC.

9.   Joyner now presents the following claims in federal habeas, all of which have

been preserved as constitutional claims.

5

I.

THE TRIAL COURT ERRED IN DENYING JOYNER'S MOTION TO PERMIT TESTIMONY CONCERNING PRIOR CLAIMS OF SEXUAL ABUSE MADE BY THE ALLEGED VICTIM.   THIS VIOLATED JOYNER'S CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE.

10. By written motion in compliance with Ark. Code Ann. § 16-42-101, months before trial Joyner filed a Motion to Admit Evidence of Prior Sexual Conduct. (Trial Record 60-62) and an essentially identical motion just before trial (Trial Record 120-123) The motion alleged:

- ❑ The alleged victim, S.O., had made prior allegations of sexual assault against other males in the family relationship.

- ❑ The prior allegations demonstrate the knowledge of the alleged victim to make such allegations.

- ❑ The purported injury to her genital area could have been from the prior sexual conduct.

- ❑ The information is relevant and necessary to the defense and its probative value outweighs any ephemeral inflammatory or prejudicial nature which it might have.

- ❑ The denial of the motion would also violate Joyner's federal and state constitutional right to present a defense.

6

11.  As discussed below, the Arkansas courts' decisions denying Joyner relief were contrary to or an unreasonable application of United States Supreme Court decisions on point.  Those decisions include *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038 (1973);  *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920 (1967); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105 (1974);  Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704 (1987); *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142 (1986); and *Olden v. Kentucky*,  488 U.S. 227, 109 S.Ct. 480 (1988).

12.  A hearing on the motion was held at the time of trial.  (Trial Record  456-515)  At the hearing, Joyner presented the testimony of Tammy Mosley—a friend of Sabrina Oden's missing mother, Jennifer Oden—  and her daughter Destiny Dixon, as well as exhibits and affidavits connected with them.   The testimony and exhibits dealt with two incidents of molestation undergone by S.O..   The prime significance of the molestations is that they could have caused the physical manifestations testified to by Dr. Jerry Jones which were used to support the alleged victim's testimony.  The two incidents involved a man named Lavelle and a man named "Chuckie McKee," also spelled McGee and McGhee.   The circuit court originally denied the motion as to both incidents, regularly sustaining the State's objections to hearsay, but for which the defense proffered the evidence.   During the trial, however, the State conceded the partial admissibility of the Lavelle incident, but the McKee incident was still

7

excluded over defense objection.     The issue, therefore, has to do with the McKee matter.

13.   Joyner first proffered as exhibits two intake forms (Hearing Exs. 1 and 2, Trial Record . 1237-1245,)   from Louisiana child protective services showing that Mosley had reported two acts of molestation of Sabrina.   Exhibit 1 involved Lavelle and Exhibit. 2 involved McKee.   The McKee report from 2001 indicated that a Joe Bryan had reported that Jennifer Oden had told him that she had walked in on McKee having sex with S.O..

14.   Joyner called as witnesses Tammy Mosley and Mosley's daughter Destiny Dixon, as well as proffering affidavits executed by them,     (Hearing Exhibits. 3 and 4, Trial Record. 1245-1247).     The Mosley affidavit, in accordance with her testimony, was that she knew of sexual assaults in July 2000 and March 2001 on Sabrina Oden by Lavelle and McKee respectively.   She took Sabrina to the hospital and was informed she had a vaginal tear and vaginal bleeding..   She said her daughter Destiny witnessed the Lavelle incident a and was herself a victim.   She also said she had first hand knowlege of the McKee molestation.   She concluded that S.O. was not a virgin when she accused Timothy Joyner in 2006.   Destiny Dickson's affidavit stated inter alia that she was a witness and co-victim of Lavelle.     In her testimony, Mosley adopted her affidavit.   .

8

15.    After Mosley and Dickson testified, Joyner argued that the motion should be granted.   In the colloquy,   in response to the State's invocation of hearsay rules, Joyner sought to call S.O. as a witness.   The circuit court explicitly refused to permit Joyner to call the girl as a witness in the hearing.      Trial counsel proffered the proposed testimony:

> MR. JAMES:  Then I -- then I would expect that the testimony would be if I could put her on the stand -- if I was allowed to -- to do that.  That, ah, that that she in fact -- these things did happen to her.  That she was there -- that her mother did walk in on her being raped by a grown man in 2001.
>
> (Trial Record 498)

16.    At one point the trial court appeared to rest its decision on the State's position that the hearing could not be reopened, but it then appeared to rest its decision on relevancy.   In any event, the record was later reopened when the State admitted that the other event alleged in the rape shield hearing did in fact occur. Moreover, when the defense restated its objections, the decision was on the merits. Therefore, it is clear that the issue was not decided on a matter of procedural default, but even if it were, it would be an abuse of discretion to forbid reopening just moments after resting and before the court had ruled.   Rule 611, A.R.E..

17. When the matter was reopened, the prosecution informed the Court that it had interviewed Sabrina about the allegations, and that she had denied the McKee

9

incident had occurred but agreed that the Lavelle incident indeed did happen.

18. Eventually the Court decided to permit certain questions of Dr. Jones relative to prior trauma on the issue and the parties agreed to a stipulation read to the jury that " 1. That Sabrina was digitally penetrated in an assault that occurred in July 2000. 2. That Sabrina Oden was taken to a Social Service Agency at that time; and 3. That Sabrina Oden would testify that she does not remember vaginal bleeding after the assault in 2000." (Trial Record 1030)     The trial court and prosecutor agreed that Joyner's objections to the exclusion of questions on the McKee incident had been properly preserved.  (Trial Record 682)

19. The trial court initially erred in refusing to permit Joyner to call S.O. in the rape shield hearing.  By doing so, the trial court ignored the rationale behind the fact that the hearing is in camera.   The in camera requirement is an obvious tradeoff between the right of the defendant to make a showing of the evidence which he believes to be relevant and the right of the alleged victim to privacy.   In *Sterling v. State*, 267 Ark. 208, 210, 590 S.W.2d 254, 255 (1979), the Arkansas Supreme Court held that:

> This statute clearly allows evidence of the alleged victim's prior sexual conduct, as well as evidence directly pertaining to the acts upon which the present prosecution is based, to be introduced or inquired about at the in camera hearing. The purpose of such hearing is to review

> the evidence to determine whether it is relevant for trial
> purposes. Unless the court hears such evidence, it cannot
> properly determine its relevancy. Such conduct, including
> conduct on the date or at the time of the alleged offense, is
> proper at the pretrial hearing.

20.   Although a trial court clearly has the power to limit questioning, the categorical prohibition of a defendant to call an accuser in a rape shield hearing violates federal and state constitutional rights of confrontation and compulsory process as guaranteed by the Sixth and Fourteenth Amendments as well as the Fifth and Fourteenth Amendments right of due process, comprising the right to present a defense specifically invoked in the rape shield motion and in oral argument thereon. (Trial Record 60-62. 120-122, 499)

21.   Thus the specific targeted issue was:   Did Chuckie McGhee have sexual contact with her when she was about seven years old and, if so, what was the nature of that conduct?

22.   Joyner is entitled to habeas relief because he was denied the right to establish those facts from S.O. herself in circumstances of privacy of an *in camera* hearing. He was prejudiced because the evidence would have been relevant, indeed crucial, to the jury's evaluation of the testimony of Dr. Jerry Jones, which was propounded as confirmation of the trial testimony of S.O.   The following is an abstract of Jones's testimony:

11

When I conducted the exam in May of '06, there was an area of her hymen in the back portion in which there was a piece of the hymen that was essentially missing. It was gone. If you think of it as a clock superimposed in the genital area with the back of the child being up at 12:00 o'clock, then this was between 12:45 and 1:15 that the piece was missing. In other words, for a child this would be in the back and slightly to the child's left. This is clear evidence that an object has penetrated between the labia, the lips on the outside, into the genital quest and impacted the hymen, caused trauma to it, injury to it sometime in the past. This was not a fresh injury. This was from sometime in the past. It was not red or raw. There was no blood. It was at least a week old probably at least two weeks. That is an area that heals very quickly. It is possible that it could be years old. I cannot really say anything about the object that penetrated the hymen. I can see the effects of an object, but I cannot identify the object. It is possible for this to be an occurrence from a finger even as far back as 2000. If someone had sex with her in March of that same year, that would also be consistent with the injury. There is no more information that I can give about what caused it.
(Trial Record  615-616)

23. On cross examination, he concluded:

All I know is that at some point in this girl's life, she was penetrated by some object, and it did some damage to the hymen.
(Trial Record  622)

24. Thus, considering Jones's testimony, the refusal of the trial court to permit the defense to ask her the questions about the McGhee incident, even in the privacy of an in camera hearing, caused irreparable prejudice to Joyner's defense.  The State

also asserted a "heads I win, tails you lose" position regarding the nature and quantum of proof necessary to be permitted to present evidence encompassed by the rape shield statute.    The alleged victim could not be called and  the mother of the child—who supposedly witnessed the event— was unavailable, having disappeared. (T 865, Abs. 206).   Joyner presented the testimony he could: The witness Tammy Mosley, who affirmed her affidavit about the McGhee incident, as well as contemporaneous documents regarding the incident.   These were met with hearsay objections, which the trial court sustained. [1]

25.   But even assuming that it is hearsay, the trial court's ruling evinced a fundamental misunderstanding of Ark. Code Ann § 16-42-101.    The statute encompasses evidence to be elicited  through "direct examination of any defense witness or through cross-examination of the victim or other prosecution witness." The trial court is to determine what "evidence, if any, may be introduced by the defendant and the nature of the questions to be permitted in accordance with the applicable rules of evidence."   The applicable rules of evidence, as established by case law, is that one may ask a question if there is a good faith basis. *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996); *Mackey v. State*, 279 Ark. 307, 651 S.W.2d

---

[1]  The ineffectiveness of counsel related to the preservation of the claims is raised in Issue II.

82 (1983).   This is true even if the basis for the question might not be provable by strictly admissible evidence.

26.   The Arkansas Supreme Court held in *State v. Townsend*, 366 Ark. 152, 160-161, 233 S.W.3d 680, 686-687 (2006), that the State's introduction of medical evidence involving the allegations makes relevant other medical testimony or questioning concerning an alternative source of the medical evidence.   More particularly, the *Townsend* court gave an imprimatur to the elicitation of the evidence as a hearsay exception, in order to avoid "further emotional stress and prejudice to the minor victim."   Although *Townsend* was focused on trial testimony, the case allows a relaxation of the hearsay rules even in a trial situation.   Simple logic dictates that if hearsay is going to be admissible in a trial context, and if the trial court is going to ban the calling of the alleged victim in the in camera hearing, this relaxation of the rules of evidence   logically must extend to the rape shield   hearing itself.   The Arkansas courts' refusal to so recognize that renders the Arkansas courts' ruling an inadequate state ground.

27.   The rape shield statute, Ark. Code Ann. § 16-42-101, now also promulgated as Rule 411 of the Arkansas Rules of Evidence,   does not create a   bar to the presentation of prior sexual conduct evidence.   Rather, the statute sets forth a different weighing calculus than that articulated in Rule 403.   This side-by-side

14

comparison shows the difference.

| Provision | Standard |
|-----------|----------|
| ACA § 16-42-101 | Admissible only if " probative value outweighs its inflammatory or prejudicial nature" |
| Rule 403 | Admissible unless "probative value is substantially outweighed by the danger of unfair prejudice." |

28. The probative value that the noted vaginal phenomena came from another sexual assault outweighs any inflammation or prejudice, particularly since *Townsend* permits hearsay. As Joyner argued to the trial court, the exclusion of this evidence also violated his federal and state constitutional right to present a defense. Under the particular circumstances of this case, the exclusion of this evidence going to Dr. Jones' verification of the alleged physical manifestations motive violated Joyner's federal and state constitutional rights and requires reversal of his convictions. What Joyner sought to inquire about was not some gratuitous and inflammatory evidence about Oden's sex life, but rather another explanation for physical facts inextricably intertwined with the charge against him.

29. Thus, in summary, the trial court erred in refusing to permit Joyner to call the alleged victim in the in camera hearing, in refusing to consider hearsay evidence at

the hearing despite the clear dictates of case law and, ultimately, in refusing to permit Joyner to inquire about in any fashion about the McGhee incident's possible impact on the physical findings.    He was prejudiced because of the important nexus of the State's presentation of Dr. Jones' physical findings to verify the alleged victim's story.

30.   In *Lajoie v. Thompson*, 217 F.3d 663 (9th Cir. 2000), a strikingly similar case involving alternative sources of injury, the Court relied on cases including *Crane, Rock,* and *Chambers* for the proposition that such exclusion violates the constitutional right to present a defense.

31.   In affirming Joyner's convictions, the Arkansas Supreme Court majority relied on *Sterling* to state a categorical prohibition against calling the alleged victim. The opinion said:

> Appellant further argues that it was an abuse of discretion for the circuit court to decline his request to call S.O. as a witness at the in camera hearing. He also contends that such a denial violated his state and federal constitutional rights of compulsory process as guaranteed by the Sixth and Fourteenth Amendments and Article 2, § 10 of the Arkansas Constitution, as well as the Fifth and Fourteenth Amendments and Article 2, § 8 right of due process, comprising the right to present a defense. The State responds, asserting that there is no entitlement to question the victim at a rape-shield hearing.
> The in camera hearing is not designed to be used as a subterfuge to obtain a discovery deposition from the alleged victim. Sterling v. State, 267 Ark. 208, 590 S.W.2d 254 (1979). There is no requirement that the victim present herself for questioning by the accused. Id. Appellant argues

16

on appeal that this "blanket statement should not be the law."However, he has provided no convincing authority to change the law set out in Sterling, and we affirm the circuit court's ruling on this point. See, e.g., Talbert v. State, 367 Ark. 262, 239 S.W.3d 504 (2006).

We also reject Appellant's argument that the rape-shield statute, as applied to this case, violates his constitutional right to present a defense. Appellant was able to present a defense. He cross-examined Dr. Jones, who testified that the injury to S.O.'s vaginal area was "not a fresh injury," but "occurred sometime in the past." Appellant was able to cross-examine S.O. at trial about her allegations against Appellant. Moreover, the parties stipulated to the 2000 sexual abuse, allowing Appellant to offer evidence to the jury of an alternative source of the damage to S.O.'s hymen. Because we cannot say that Appellant's constitutional rights were violated, we affirm the circuit court's ruling on this point.

2009 Ark. 168 at 6,  303 S.W.3d 54 at 58-59

32.  The intimation in the Arkansas court's opinion that there was some sort of procedural default for failure to present "convincing authority" is misleading and is not an adequate and independent state ground for denial of relief.  Joyner had argued in his brief:

Although there are some older cases holding that a rape shield hearing is not a substitute for discovery and "(T)here is no requirement that the victim present herself for questioning by the accused."  Sterling, supra, that blanket statement should not be the law.  Although a trial court clearly has the power to limit questioning, the categorical prohibition of  a defendant to call an alleged victim in a rape shield hearing violates federal and state constitutional

rights of confrontation and compulsory process as guaranteed by the Sixth and Fourteenth Amendments and Article 2 § 10 of the Arkansas Constitution as well as the Fifth and Fourteenth Amendments and Article 2 § 8 right of due process, comprising the right to present a defense specifically invoked in the rape shield motion and in oral argument thereon.   (T 60-62. 120-122, 499, Abs. 86, Add. 24-26, 30-31)    But even laying the constitutional issues aside, it was also an abuse of discretion for the trial court to refuse to permit in camera inquiry of Sabrina Oden on the specific targeted issue:   Did Chuckie McKee have sexual contact with her when she was about seven years old and, if so, what was the nature of that conduct?

---

As Joyner argued to the trial court, the exclusion of this evidence also violated his federal and state constitutional right to present a defense.      Joyner is not challenging here the facial constitutionality of the law.    Instead, his position is that as applied to the particular facts of this case, the exclusion of this evidence violated those constitutional rights.    The leading cases on the right to present a defense are Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038 (1973);   Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920 (1967);    Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105 (1974);  Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704 (1987); and  Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142 (1986).

Under the particular circumstances of this case, the exclusion of this evidence going to Dr. Jones' verification of the alleged physical manifestations motive violated Joyner's federal and state constitutional rights and requires reversal of his convictions.  What Joyner sought to inquire about was not some gratuitous and inflammatory evidence about Oden's sex life, but rather another explanation for physical facts inextricably intertwined with the charge against him.

Thus, in summary, the trial court erred in refusing to

permit Joyner to call the alleged victim in the in camera hearing, in refusing to consider hearsay evidence at the hearing despite the clear dictates of case law and, ultimately, in refusing to permit Joyner to inquire about in any fashion about the McKee incident's possible impact on the physical findings.    He was prejudiced because of the important nexus of the State's presentation of Dr. Jones' physical findings to verify the alleged victim's story.

33.  The two concurring justices disagreed with the categorical prohibition but held the error to be harmless.

34.  There is a reasonable probability that the result would have been different had he been permitted to present this evidence.  The inability to present the excluded evidence to the factfinder had a substantial and injurious effect on the verdict.

35.  On this point, this Court must grant the writ and vacate his conviction for rape and terroristic threatening.

II.

JOYNER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL. THE ARKANSAS COURTS' RESOLUTION WAS CONTRARY TO OR AN UNREASONABLE APPLICATION OF STRICKLAND V. WASHINGTON, 466 U.S. 668, 104 S.Ct. 2052 (1984),  AND ITS PROGENY.

36.  Joyner received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments.     As described below, the Arkansas courts' resolution of his claims was contrary to or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984), and its progeny.

19

A.  FAILURE TO MAKE PROPER MOTION FOR MISTRIAL.

37.  A substantial part of the prosecution's case was that Joyner's DNA was supposedly found on the accuser's underwear.   Although the results had been represented by the prosecutor and the Crime Lab as not particularly confirmatory of anything, the prosecutor and Crime Lab  ambushed Joyner at trial, and according to the Arkansas courts, trial counsel did not react swiftly enough.   Here is how the issue developed at trial:

38.  Before trial, the State submitted cuttings from cloth found in the residence to the State Crime Laboratory.   The analyst, Jennifer Beaty, did written reports (State's Ex. 32 , Trial Record  1278;   State's Ex 33, Trial Record 1279;   Def. Ex 2, Trial Record 1285P The last report, dated December 14, 2006, a year before the trial, said that the DNA tests showed that the test on certain items showed a mixture "consistent with" a mixture of Sabrina Oden and Timothy Joyner and that "1 in 70,770 randomly selected Caucasian individuals....could be expected to be included as contributors to the observed DNA mixture."

39.  Without notifying the defense, at the time of trial, Beaty recalculated the figures.   She did, and testified at trial that it definitely was Sabrina Oden's DNA on the cloth, not just "consistent with."   When it became clear during her testimony that

there had been a recalculation or alteration in the conclusions from what had been reported,   Joyner moved for a mistrial.   The motion was denied on timeliness grounds. (Trial Record 795)   A motion for new trial (Trial Record 138-156) was denied on the same basis.  (Trial Record  158-160)

40.  After Beaty's qualifications were established, the DNA swabs, Exhibits 24 from S.O.  and 25 from Timothy Joyner were introduced.  She then testified, as abstracted:

> Q.  Okay.  Now, so on Q1-E22, ah, we've got Sabrina's DNA and we have Timothy Joyner can't be excluded is that the way you say it?
>
> MR. JAMES:  I object to her saying Sabrina's DNA cause I don't think it's been identified as that.  I think it's a mischaracterize this to the Jury.  I think she said it's consistent with it.  She's not made an identification statement so the Prosecutor's continued to do that.
>
> THE COURT:  Okay, would you rephrase please.
>
> MS. BEATY CONTINUING AS QUESTIONED BY MS. MEYER:
>
> The DNA identified on Q1-4S is consistent with Sabrina Oden. The statistics there are one in four point four six quadrillion.  I can make an identity statement on that, but I didn't report it as that way. In my opinion, that is Sabrina's DNA.
>
> (Trial Record  740)

---

> Q. All right.   All right.     Ah, so in conclusion the significant part of your findings are that we've got Sabrina

Oden's DNA on E-22.

MR. JAMES:  Objection, that's not what she said.  It's a mischaracterization again.

MS. MEYER:  She made an identification statement.

MR. JAMES:  She said it was consistent.

MS. BEATY CONTINUING AS QUESTIONED BY MS. MEYER:

I didn't report the identification statement. It is consistent with Sabrina Oden. In the statistics that I just brought to give you an idea of the likelihood that it is Sabrina Oden's, is one in four point four six quadrillion. If I reported that, I would have reported an identity statement. It is consistent with Sabrina Oden. It is basically her DNA. On the underwear, there were ten areas that had a mixture indicating more than one that wasn't Sabrina. From that mixture, one in seventy thousand seven hundred and seventy randomly chosen Caucasian individuals would be expected to be included in the DNA mixture. Without testing, I definitely can't exclude anyone. Relatives do not have identical profiles as other relatives. You would see similarities, but you would not see an identical DNA profile.

CROSS EXAMINATION BY MR. JAMES:

My analysis on this case was done a year ago, almost to the day.

MR. JAMES:  Let me mark as this Defense Exhibit Number Two please.  Your Honor, move to introduce Number Two which is the lab report.  I've shown it to the Prosecutor.

MS. MEYER:  No objection.

THE COURT:  It'll be admitted.

THE WITNESS, AS ABSTRACTED:

Defense Exhibit Number Two is my report. The date on that is 12-14-2006. I do need a copy of that. We have spoken before on this case. It was a while ago. On that report, before that I had the oral swabs from Sabrina Oden. The DNA was extracted from Q1-4S the cutting from the

underwear indicated the presence of mixture from more than one individual at ten out of sixteen loci. It is noted that the major component of DNA identified on Q1-4S is consistent with the DNA profile obtained from E-24, Sabrina Oden. Since the underwear was submitted to me as victim's underwear, I did not do statistics, because if it came from the victim why do statistics. I did calculate statistics in case I was asked that. I did that the day before trial, yesterday.

MR. JAMES:  May we approach, Your Honor?

MR. JAMES CONTINUING:

Q.  When did you give it to the Prosecutor?

A.  I hadn't -- these are just --

MR. JAMES:  May we approach, Your Honor?

THE COURT:  Yes.

THEREUPON, THE FOLLOWING PROCEEDINGS ARE HAD AT THE BENCH OUT OF THE HEARING OF THE JURY:

MR. JAMES:  I'm moving for a mistrial.  I mean I wasn't giving this information.  This is new -- I mean I had this information -- I got up on opening statement and gave an opening statement based on the report that she gave -- had given to me that's been in the file and had for a year. And now she's -- she's come in here and I mean obviously she testified to it before lunch but now she's changed -- she's -- I mean her -- her the -- the opinions I was given as an -- from the expert has now changed.

MS. MEYER:  No, the opinion has not changed.

MR. JAMES:  The opinion has changed.  She -- I mean, she -- she had told me and the report indicates that it's merely consistent.  But now, --

MS. MEYER:  The only thing she's done is she's supplemented that report by calculating the statistics under which it is -- it is consistent.

MR. JAMES:  Change --

MS. MEYER:  It's simply an underlying calculation. It's not inconsistent.  It is not a change.  It is the statistics

23

that support that conclusion.

MR. JAMES:  It's not inconsistent but it ain't the same. I mean, her --

THE COURT:  Okay, so her statistics aren't contained within --

MR. JAMES:  Well, it's not --

THE COURT:  -- Defense's Exhibit Two.

MR. JAMES:  -- it's not just her statistics.  Apparently her opinion --

MS. MEYER:  None of her --

MR. JAMES:  -- has now changed.  Because now she's made an identification.  And the -- the evidence and the -- the report I was given indicates that it's merely consistent. Now, she's saying that it -- that it -- now she has positively identified this sample as being hers.

I mean I had an DNA expert that -- that would counter that.  I mean my -- my DNA expert was consistent with hers.  And then I get this -- I mean I would have had him -- I mean the Prosecutor's been on notice from this individual. I didn't bring him because he came up with the same thing she did.  And so now --

MS. MEYER:  Your Honor, the -- the reports that the Court has and I'll be glad to admit all the DNA reports. None of them contain the underlying statistics and calculations.   The work sheets are not included in the reports.

MR. JAMES:  Okay, I'm not talking about -- I'm not talking about reports.  I'm talking about statistics.  I'm talking about her opinion.  Her opinion apparently is now that this is her -- that she is making identification that this sample equates to Sabrina.

Now, as far as I knew obviously in opening statement I hadn't been given that opinion cause I sure wouldn't stand in front of the Jury and tell them something otherwise.  If there's -- if I would have known that her opinion was different than that.  And I mean I certainly have a right to an opinion, the opinions of experts.

And frankly, I didn't quite catch what she had said she had done in -- in the -- in the direct.  I mean but now I understand what she's done.  I mean now she's -- I mean she's basically changed her opinion.

MS. MEYER:  Absolutely now.  There's no change of opinion here.

MR. JAMES:  She was telling me that's her opinion that it's only consistent.  That she's not identifying this as her because that says consistent.

MS. MEYER:  It's consistent.

MR. JAMES:  And that's what my expert said.  And that's all my expert said.

MS. MEYER:  I asked her what the statistics are that support that.  She told you the numbers.  Based on the science of DNA what are the -- you know, how high does the number going to get before you can make an identification.

MR. JAMES:  Well, but -- the --

MS. MEYER:  Your -- your expert saw all of her working papers.  He could calculate that statistic.

MR. JAMES:  He agrees with this report.  He doesn't agree with what she just said.

MS. MEYER:  He -- he -- they were provided all -- I went --

MR. JAMES:  I understand --

MS. MEYER:  -- I went to --

MR. JAMES:  But that's not the point, Judge.

MS. MEYER:  Can we go outside of the Jury if we're going to --

MR. JAMES:  Yeah, can we do that I think it's that important.

THE COURT:  Okay.  Well, we don't have a room to put the Jury in.  I guess -- I guess we'll just have to retire to chambers and take this up.

(Trial Record  748-757)

41.  In the in-chambers hearing, trial counsel argued that by the withholding of

the information that the calculations had been redone from merely consistent to a statement of identity, this affected defense credibility with the jury because of statements made in opening concerning the DNA, in reliance on the written reports and his conversations with Beaty.   Counsel also argued that the information should be imputed to the State whether or not the prosecution actually knew.   Counsel also noted that he had retained an expert, but in reliance on Beaty's reports did not have the expert present.   (Trial Record  759-764)

42. Examined in chambers by defense counsel, Beaty said, as abstracted:

> On direct, I believe I talked about the fact that I had done this report December 14th, 2006. Yesterday I did not do new calculations. We were submitted the victim's underwear. If it is submitted to us as victim's underwear, we usually do not do statistics on it, because it is consistent with the victim. If it s the victim's underwear, it is known to be her underwear, why do statistics. This is just to back up that this is consistent with her. This is her DNA. In my expert opinion, this is in fact Sabrina's DNA. I would not agree that that is different from the opinion on my report. On the report it is saying that it is consistent with the DNA profile obtained from E-24. Just that the major component of the Q1-4S is consistent with her DNA profile, which means that they are one and the same. It means that every area that we have got matched. If we know for sure that it is someone, we do an identity statement. I do not make an identity statement on the report. I did not tell you that when I spoke to you about a year ago. I didn't tell the Prosecutor the identity statement. I didn't tell her before Court. I guess I thought it was understood, as far as the identity, with the major component being identified in Q1-4S as consistent

26

with DNA of Sabrina Oden.

We did speak. I don't deny that I told you I couldn't say for sure if it was her. I don't remember exactly what all was said. This report doesn't say that I am making an identification statement. An identification statement is when your statistics are greater than three hundred billion. That is a degree of scientific certainty. I didn't do the statistics on that. With this being consistent, there is no area unlike that of Sabrina Oden's. In my opinion, that would be her DNA. What I am saying is that the only thing that would be different about the report is that I would have had included the statistics and there is an exclusion statement saying that the major component of Q1-4S originated from E-24, Sabrina Oden. It would say within all scientific certainty. Those reports are written by me right when we do the statistics.

(Trial Record 765-769)

43. In response to the prosecutor's claim of untimeliness, defense counsel said:

MR. JAMES: I objected no less than three or four times to the Prosecutor saying this is her. I said, Your Honor, objection, her testimony is consistent. She has not done that. And -- and so it -- so it was never whether it was fully developed or not. It was never really clear and it went back and forth and back and forth and then right towards the end she said this is -- yeah, this is her in my opinion.

And -- and -- and frankly I don't think it was crystal clear that she had actually that -- that, ah, certainly these numbers had never been provided. And I was trying to figure -- I mean again I'm not a DNA expert but what she has testified to and what she has now said her opinion is is not consistent with this lab report.

The Court has seen these lab reports. The Court knows what this does. She's told you she's done calculations that

27

-- that -- that she's done new calculations that nobody had. And arguably at the behest of the Prosecution who talked to her a week ago.

I mean I -- I have a right to a -- to -- I mean -- well, yes, did I have an expert, yes. Did he look at it? And he said yes, it is -- I believe that her report is on. Is right on. He agrees with the report that I got not with the report that says this is her. That this is an identification -- that I can make an identification of her anything else for that matter.

It -- the report that I had said it's consistent. And there's a hierarchy in the terminology, term of art used, ah, by DNA experts. And we're at the top now. And -- and the report I got gave that this was consistent. Now, you know, it -- it's consistent with but now it's also beyond that.

And -- and I -- and based on the representations of the State's Crime Lab I was -- I -- I gave information to the Jury and spoke to the Jury and -- and said things to them and -- and fashioned my case in a way that I would not have done. And yes, you can cross examine it but you can't un-ring the bell. And I can't change her opinion. And I don't have an expert to -- to counter it either.

So I mean I -- I don't know about the timeliness because I think the Court will note I objected three times to her saying that. And then they'd kind of back off and say, okay, consistent and consistent. And we play that little game for a while. And then boom, yes, it's her.

MS. MEYER: I don't know --

MR. JAMES: And I -- I like I said it wasn't clear to me until the first question. If the Prosecution thinks I'm letting all that stuff get in and then waiting to ponder it a little bit and find -- and then get the -- get the bad answer again. I mean that's preposterous. I mean I objected every time that I -- I thought that's what they were doing. I thought she was trying to intimate that her opinion was more than it was. When affect it was her opinion and I just -- and she just didn't get around to it towards the end. And I didn't make it clear -- it wasn't clear to me that that's what she

was going until I started direct examination or cross examination. And that's when I -- that was the first thing I asked her. Because I wanted to clarify that her -- because I didn't think that was her opinion. Because I was told that it's merely consistent and not that she had made a scientific certainty identification.

MS. MEYER: If you replay Ms. Beaty's testimony on direct that was the first thing she discussed right out of the shoot is the four quadrillion or whatever the number is. And that was never objected to.

THE COURT: Well, she did mention the four quadrillion figure you know right after you on the direct examination after foundation was laid as far as the initial testing on underwear, two towels she'd received from serology. And then the known samples from Sabrina and Timothy Joyner.

MR. JAMES: But she didn't say it was an identification. She's talking about random people. We're -- we're talking about -- we're beyond that, Your Honor. She's saying it is absolutely her. She -- I, ah, I always -- indicated from my discussions with her that she can't exclude the mother. And now she -- I mean and --

THE COURT: And then she referred to that figure again when she's referring to Q-1 which is E-22 stating in her opinion or in my opinion, yes, it is Sabrina's DNA on the panties.

So the Court does have concern about the timeliness of any objection or --

MR. JAMES: But it was -- but, ah, Your Honor, I was just -- again I objected every time the Prosecutor said so it's her. And I objected to that saying she's misconstruing her opinion. And now -- and then her opinion is it is her.

And, I mean it just wasn't clear. Because she kept going consistent consistent. She kept the consistent game. And I mean it's not consistent -- I mean it's consistent to the extent it's consistent. But she's -- but her opinion's higher than that. I mean, you -- I mean -- I mean for at least

three times I objected.  She's trying to say that -- that it's her and it's only consistent.  And now she's saying -- and then -- and then I objected like three times she asked her that question or the Prosecutor would say, so it's her.  No, objection she's misconstruing it to the Jury.

MS. MEYER:  I disagree with the way he recounts the way objections were made.  But Mr. -- Mr. James is attempting to say there's some kind of hierarchy here.  Consistent is not -- is not -- this isn't some sort of a stepping stone that you're climbing up.

MR. JAMES:  Exactly what it is.  That's exactly what she testified to.

MS. MEYER:  It's consistent and there the statistics to support --

MR. JAMES:  You have excludable, not excludable, consistent, and -- and then within a degree of scientific certainty.

And now she's saying it's within a degree of scientific certainty.  That she did -- and -- and that's not what the report I was given was.

And it's uncontroverted this all came up what, yesterday?  I guess she didn't even do it until yesterday.

MS. MEYER:  I think it's also uncontroverted that the underlying data's been provided to Mr. James.  He could do any time.

MR. JAMES:  And my expert says it's consistent with the report I was given.  Not consistent with the four quadrillion number.  My expert was given their report, their data.  And my -- and my expert said it's consistent.  Not using the DNA terminology of consistent or just -- I mean, that it, yes, he agrees with her opinion.

He agrees with the opinion that I was given, not the opinion that we came up with today or the numbers that I was -- that we came up with today.

THE COURT:  After considering the Defendant's motion for a mistrial the Court will deny the motion.  And you may resume with your cross examination of Ms. Beaty.

30

MS. MEYER:  Do you want to state your basis for that ruling.

THE COURT:   Well, the basis would be that the motion was not timely made when this was first testified to by the witness.  And second, that all materials from the file of the -- of Ms. Beaty were supplied to the Defendant.

MR. JAMES:  Okay.  For the record, the Court's not finding that I was given the calculations that were done yesterday.

THE COURT: No.

MR. JAMES:  Is it?

THE COURT: No, not her statistical calculations that she -- she said she didn't do that until yesterday.  And didn't provide that to the State or the Defense.

(Trial Record  790-795)

44.   In *Joyner I* , the state Supreme Court held that the claim was defaulted because of untimeliness.  On appeal from denial of Rule 37 relief in *Joyner II,* the Court held:

> On review, Joyner must first show that James made errors so serious that James was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. Williams, 369 Ark. 104, 251 S.W.3d 290. Joyner must show that James's performance fell below an objective standard of reasonableness. Springs, 2012 Ark. 87, 387 S.W.3d 143. We are unpersuaded that the circuit court erred in denying Joyner relief on this claim. Here, a thorough review of the record discussed above demonstrates that despite Joyner's argument, Joyner and the State retained the same report and information—the report provided to both parties stated

31

that the match was 16 out of 16. Further, although Joyner
argues that Beaty's testimony was changed or new, neither
party was aware of the testimony that Joyner alleges was
new—the calculations. And although Joyner argues that
the degree of certainty changed and that Beaty's opinion
was new, the record demonstrates that Beaty's testimony
remained the same: the DNA on the underwear found in
S.O.'s room was a strong match to S.O.'s DNA and
consistent with S.O.'s DNA profile. Finally, we also note
that other evidence supported the match to S.O., including
S.O.'s own testimony. Based on our discussion above, a
careful review of the record demonstrates that Joyner has
failed to meet his burden under the first Strickland prong
because he has not demonstrated that James's performance
fell below an objective standard of reasonableness. In sum,
because we conclude that the performance of Joyner's trial
counsel was not deficient, we need not address the
prejudice requirement, which is the  second prong under
Strickland. Williams v. State, 2011 Ark. 489, 385 S.W.3d
228. Accordingly, we affirm the circuit court on this point.

2021 Ark. 78 at 13-14,  621 S.W.3d at 133-134.

45.   This is an unreasonable application of *Strickland*.  By its own admission the
state court decided this on the cause prong only.   But counsel's failure to comply
with the procedural requisites, including timeliness, for making a mistrial motion is
inherently and  objectively a failure to reach the appropriate level of competence.
Simply put, the decision whether to move for a mistrial may be a strategic or tactical
judgment, but the failure to consummate the procedure to do what one has decided
to do cannot be clothed with the strategic or tactical excuse.   In fact, trial counsel

32

admitted as much in the Rule 37 hearing:

> Most certainly if I would have been timely he would
> have gotten a new trial. I would have thought or the
> mistrial would have been found to have been appropriate
> and he would have got that new trial at that time. If I had
> of done that.
>
> (Rule 37 Record 430)

46. With regard to the prejudice claim unresolved by the Supreme Court, to the extent that the court "looks through" to the circuit court decision, that decision was flatly wrong:   The circuit court applied the wrong standard:

> In this case where the victim testified and there was other
> overwhelming evidence of guilt for the jury to consider, the
> burden for the Defendant to show that the fact-finder
> **would have a different outcome** [emphasis supplied by
> Joyner] considering this claim solely is a significant and
> (sic) one the defendant cannot carry.

47.   Joyner does not have a "would have" obligation, but rather merely a "reasonable probability" of a different result, one that does not even reach the preponderance standard.   *Williams v. Taylor*,   529 U.S. 362,   405-406,   120 S.Ct. 1495, 1529 (2000) (Justice O'Connor   delivering the opinion of the Court with respect to Part II.)

Applying the correct standard for determination of prejudice,   Joyner was definitely prejudiced.   He ended up having a trial in which his counsel was prepared under a

different understanding of the scientific evidence than what was presented, due to the withholding of the new and much more damaging calculations.

48.   The prosecutor was required by Rule 17.1(a)(4) of the Arkansas Rules of Criminal Procedure to have provided the new Beaty calculations before trial: "(iv) any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations, scientific tests, experiments or comparisons."   Trial counsel was taken off guard  by the Beaty testimony giving a positive identification match.   He said at the Rule  37 hearing:

> And so, I stood in front of the jury and 13 told them no way they're going to give you that identification statement because it doesn't exist. Objected by the prosecutions opening statement when she talked about that. And then here I am in the middle of trial and now all of a sudden I was completely wrong about what she was going to say.
> (Rule 37 Record 420)

49.   Trial counsel believed that once he made part of the cornerstone of the defense that this is not an identification statement, his credibility was gone.  (Rule 37 Record 422)

50. At the hearing trial counsel  pointed to various portions of his opening where he made claims that the state was exaggerating the strength of their DNA evidence. (Rule 37 Record  423). He was attempting to place reasonable doubt in the juror's

minds regarding the strength of the DNA evidence. (Rule 37 Record 424). Being wrong about the evidence made him look like he did not know what he was talking about, or that he was lying. *Id.*

51. Trial counsel allowed the complete direct examination, and some cross, to occur without an objection. Finally, after a break, trial counsel objected. At an in-camera hearing Ms. Beaty admitted that she had not disclosed her conclusive opinion to the defense. (Ab 464; CR-20-245, R 424). However Beaty admitted that she had conversed with the prosecutor:

> The last time I talked to the Prosecutor about this case was last week. They told me and you told me that there was an issue about whose DNA it was. A week ago when I talked to the Prosecutor, they told me that there was an issue about whose DNA it was. The Prosecutor told me, and I calculated it. I knew beforehand that it was her. I didn't put that in my report, because it is consistent with hers. I mean it is her, the major component.
> (Trial Record 783)

52. On this point, Joyner is entitled to vacation of his convictions. There is a reasonable probability that the result would have been different had he not received ineffective assistance of trial and Rule 37 counsel, and the inability to present the excluded evidence to the factfinder had a substantial and injurious effect on the verdict.

B. FAILURE TO PRESENT ADMISSIBLE EVIDENCE IN RAPE SHIELD

HEARING.

53. As discussed in Claim I, one of the major issues in the case was that Joyner was forbidden to present evidence with regard to an alternative source of the accuser's injury. In *Joyner I*, the state Supreme Court held:

> In the present case, Appellant is attempting to introduce prior sexual conduct to prove that there was an alternate source for the victims's injury, rather than an alternate source for her sexual knowledge. The State asserts that the rationale behind the factors set out in Townsend is equally applicable here. We agree and adopt Townsend for this situation. Under an analysis of the Townsend factors, Appellant's offer of proof fails. The circuit court found that Appellant failed to meet the first factor of the test because Appellant did not prove that the prior act clearly occurred. Appellant presented the testimony of Tammy and D.D. and their affidavits, all of which were determined by the circuit court to be hearsay. The only other proof he presented was a CIP Intake report, admitted for the purposes of the rape-shield hearing, which was never authenticated. The CIP report alleged that Chuck McGhee sexually abused S.O. by vaginal penetration. S.O. would have been approximately five years old at the time of the alleged 2001 assault by Chuck McGhee. S.O. told the prosecution that she did not remember being sexually abused in 2001. There is no substantial evidence to prove that the alleged sexual abuse by Chuck McGhee in 2001 "clearly occurred." Appellant has failed to meet the first factor, therefore it is not necessary to discuss the remaining factors. Because Appellant has failed to meet the test set out in Townsend, it was not a manifest abuse of discretion for the circuit court to exclude evidence regarding the alleged 2001 sexual abuse.
>
> 2009 Ark. 168 at 7, 303 S.W.3d at 58

54. In *Joyner II,* the state Supreme Court denied relief because:

> To prevail in this case, Joyner "must identify the witness, provide a summary of the testimony, and establish that the testimony would have been admissible into evidence. Wertz v. State, 2014 Ark. 240, at 4, 434 S.W.3d 895, 900 (citing Moten v. State, 2013 Ark. 503, 2013 WL 6327549 (per curiam)). To demonstrate prejudice, Joyner is required to establish that there was a reasonable probability that, had counsel performed further investigation and presented the witness, the outcome of the trial would have been different. Hickey v. State, 2013 Ark. 237, 428 S.W.3d 446." Hinton, 2019 Ark. 136, at 8–9, 572 S.W.3d at 387.
>
> Here, the record demonstrates that Joyner did not admit any documents into evidence at the Rule 37 hearing, address how the documents would be authenticated, explain how the documents would  be admissible, or demonstrate how the contents of the report would be admissible. Accordingly, Joyner failed to demonstrate that his counsel was ineffective. Accordingly, we affirm the circuit court on this point.
>
> 2021 Ark. 78 at 17, 621 S.W.3d at 135-136

55. Joyner thus received ineffective assistance of counsel both at trial and in Rule 37, the latter providing cause under *Martinez v. Ryan*, 566 U.S. 1, 132 S.Ct. 1309 (2012), to raise the issue in habeas proceedings.  Joyner meets the cause prong involving trial counsel  under *Strickland* in that there is no strategic or tactical justification to fail to comply with the applicable rules of evidence and case law in presenting this evidence at the rape shield hearing.  Joyner meets the cause prong involving Rule 37 counsel by failure to "admit any documents into evidence at the

Rule 37 hearing, address how the documents would be authenticated, explain how the documents would be admissible, or demonstrate how the contents of the report would be admissible."

56.   Rule 37 counsel could have subpoenaed S.O. and the persons involved in creating the documents and/or the keepers of the records, and could have sought their admission under any or all of the following rules of the Arkansas Rules of Evidence in which the availability of the declarant is immaterial:

❑   Rule 803(4):" Statements for Purposes of Medical Diagnosis or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

❑   Rule 803(5): Recorded Recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

❑ Rule 803(6): "Records of Regularly Conducted Business Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or disagnoses [sic], made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

❑ Rule 803(24): "Other Exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (i) the statement is offered as evidence of a material fact; (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this

exception unless the proponent of it makes known to the adverse party sufficiently in advance to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

57.    Joyner meets the prejudice prong for the same reason that he meets the prejudice prong on Claim I:   His constitutional right to present a defense under the Fifth, Sixth   and Fourteenth Amendments — as established in cases such as *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038 (1973); *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920 (1967); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105 (1974); *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704 (1987); *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142 (1986); and *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480 (1988)— mandate that he be permitted to present an alternative source for the physical injury.

58.   On this point as well, Joyner is entitled to vacation of his convictions.  There is a reasonable probability that the result would have been different had he not received ineffective assistance of trial and Rule 37 counsel, and the inability to present the excluded evidence to the factfinder had a substantial and injurious effect on the verdict.

59. Joyner is entitled to a hearing in which he will present the documents at issue:

Defendant  Ex 1 to rape shield hearing (intake form) (Trial Record 1237-1241);

Defendant Exhibit . Ex. 2 to rape shield hearing (intake form) (Trial Record  1242-

1245)] by subpoenaing the persons associated with them and/or seeking  admission

under F.R.E. Rule 803(4)[statements made for medical diagnosis], 803(5) [recorded

recollection], 803(6)[regularly conducted business activity] or 807 [residual].   He

will also call the relevant witnesses, including S.O.

WHEREFORE, Joyner  prays that this Court conduct a hearing, vacate his

convictions  and for all other relief to which he may be entitled.

TIMOTHY JUSTIN JOYNER

JEFF ROSENZWEIG
Ark. Bar No. 77115
300 Spring St.  Suite 310
Little Rock, AR 72201
(501) 372-5247
(501) 376-0770 (Fax)
jrosenzweig@att.net
*Attorney for Petitioner*

## VERIFICATION

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on February $2\ 5$ , 2022.

_____
**TIMOTHY JUSTIN JOYNER**